**ADVANCED CARD TECHNOLOGIES LLC, Plaintiff,**

v.

**VERSATILE CARD TECHNOLOGY, INC., Defendant.**

**No. 04 CIV. 6888(CM).**

United States District Court, S.D. New York.

Jan. 17, 2006.

Stanley Steven Zinner, Greene & Zinner, P.C., White Plains, NY, Neil G. Cohen, General Patent Corporation International, Suffern, NY, for Plaintiff.

Jerry A. Schulman, Jerry A. Schulman, Esq., Oak Brook, IL, David S. Kashman, Gottlieb Rackman & Reisman, P.C., New York, NY, for Defendant.

## MARKMAN OPINION

McMAHON, District Judge.

The Court, for its construction of the claims in suit:

### Why a Markman Hearing in this Breach of Contract Case?

The action at bar is a breach of contract suit brought by a patentee against its licensee, for failure to remit royalties allegedly due. The licensee defends on the ground that the products on which it has refused to pay royalties are not covered by the patent and so are not subject to the license. Because defendant so contends, it is necessary to construe two patent claims, or the trier of fact will be unable to determine whether the products on which no royalties have been paid are covered by the license. Both parties have submitted extensive briefing on the construction of the two disputed claims that are in suit: Claim 8 of the so-called '158 patent, and Claim 1 of the so-called '584 patent.

### Why Construe Claims That We Know Are Invalid

The parties advise me that both of these claims (and all other claims in these two patents that allegedly read on defendant's products) were recently cancelled by the Patent Examiner, and new claims have apparently issued. One might well ask why a court should be forced to construe patent claims that it knows to be invalid. I myself have spent no little amount of time pondering that question.

The answer lies in the unusual facts of this case—facts that bring the matter within the narrow parameters of the largely-defunct doctrine of patent licensee estoppel.

Defendant originally interposed an affirmative defense and a counterclaim in which it alleged lack of validity of the claims in suit. However, defendant admittedly had continued to (and as far as I am advised, still continues to) pay royalties on some products that it manufactures under the license, and has not contended that the license is no longer valid.

In an opinion dated October 19, 2005, (hereinafter "*ACT I*"), I dismissed the Third Affirmative Defense (lack of validity of the patent) under the doctrine of licensee estoppel. Because the parties made nothing of the licensee estoppel issue, I gave it short shrift in *ACT I*. I was a bit too cursory. I did not mean in *ACT I* to suggest that the doctrine of licensee estop-

pel had not been dealt a severe blow by the United States Supreme Court's opinion in *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). However, as my esteemed colleague, Judge Kaplan, noted several years ago, "the doctrine of licensee estoppel is not entirely dead." *Revson v. Claire's Stores, Inc.,* 120 F.Supp.2d 322, 326 (S.D.N.Y.2000). It is because licensee estoppel is not dead in this case that the court is forced to construe these two defunct patent claims. That being so, the reasons why licensee estoppel applies here should be stated more fulsomely than they were in *ACT I.*

■ VCT is estopped to challenge the validity of the patents in suit because it has neither ceased payment of royalties nor notified plaintiff that the reason for cessation was the claimed invalidity of the patents. *See Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.,* 112 F.3d 1561 (Fed.Cir.), *cert denied,* 522 U.S. 996, 118 S.Ct. 560, 139 L.Ed.2d 401 (1997); *see also Medimmune, Inc. v. Genentech, Inc.,* 427 F.3d 958, 965 (Fed.Cir.2005). It is undisputed that VCT has paid and continues to pay royalties to ACT for all products that VCT believes are covered by Claims 8 of the '158 patent and 1 of the '584 patent. It is also undisputed that VCT has refused to pay royalties to ACT for other products it manufactures—the royalties that are the subject of this action—*only* because it believes that those claims do not read on certain of its products, and not because the claims are invalid. No party has suggested, and I have no reason to believe, that VCT has ever notified ACT that the reason it is not paying the royalties that are the subject of this action is that the claims in suit are invalid. Thus, the *Kohle* exception to Lear applies.

Of course, *Kohle* is a Federal Circuit opinion, and since this case does not "arise under" the patent laws, it is not going to be heard on appeal by the Federal Circuit.

It will be heard by the Second Circuit (if it goes to any Court of Appeals at all). I have not found any Second Circuit case adopting the *Kohle* exception, although as the *Kohle* court itself notes, several other Circuits, including the Third, Sixth, Ninth and Tenth, follow the same rule. *Kohle, supra,* 112 F.3d at 1568. However, the Federal Circuit's primacy in matters pertaining to patent law is such that, in the absence of direct Second Circuit precedent on the point, it is appropriate to rely on *Kohle* and to apply it to this case.

Therefore, just as the defendant in *Revson* was barred from asserting an invalidity defense to royalty payments that accrued in respect of sales occurring prior to the filing of the in that action, so here VCT may not assert its Third Affirmative Defense to royalty payments that were not made in respect of sales accruing prior to the filing of this action. That is why I must go through with this otherwise pointless exercise.

In view of the Examiner's action, I remain puzzled by defendant's stance in respect of its license. Were the defendant now to cease paying royalties on the products that it admits are covered by the invalidated claims, and notify ACT and this Court that it was doing so on the ground of invalidity, then it might well be entitled to amend its answer and reassert the stricken Third Affirmative Defense in respect of any sales made between the date of the disavowal and the date of the judgment (if any) in this action. Indeed, if it were accompanied by a complete cessation of royalty payments, VCT's assertion of the now-dismissed First Counterclaim (invalidity) could provide the requisite notice to plaintiff that defendant contested the validity of the licensed patents, thus satisfying *Kohle* and permitting the reassertion of the Third Affirmative Defense as to any sales occurring between the date of cessa-

tion and the date of judgment.[1] However, I have not been apprised of any cessation in the royalty payments that VCT had hitherto been making. Nor has VCT told anyone that it is not paying royalties *because the claims that read on its products have been invalidated.* Indeed, at our last pre-trial conference, defendant's counsel expressed some alarm at the court's suggestion that the license might in fact be invalid now that the patents contain different claims than the now-invalidated ones that existed when the parties originally contracted. Defendant's reasons for taking the position it presently adopts are, frankly, not the court's concern. I take the case as it is given to me. As given to me, the Third Affirmative Defense was properly stricken.

I have already advised the parties that any claims for royalty payments under the newly-allowed claims will have to be the subject of an entirely different lawsuit. My brain would crack under the strain of trying to reconcile all the conflicting theories.

### Principles of Claim Construction

The technique for construction of a disputed claim was set forth by the Federal Circuit in the *Markman* decision. *Markman v. Westview Instruments Inc.,* 52 F.3d 967, 976–80 (Fed.Cir.1995). The meaning of a claim should be interpreted in light of the intrinsic evidence, comprised of the claims and the specification of the patent, and the prosecution history. *Id.* at 979. The intrinsic evidence constitutes the public record of the patent on which the public is entitled to rely. *Id.* If the intrinsic evidence is sufficient to resolve the meaning of a disputed term, it is improper to resort to extrinsic evidence such as expert testimony or treatises. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed.Cir.1996). Extrinsic evidence only should be relied upon where necessary to resolve an ambiguity in a disputed claim term. *CVI/Beta Ventures, Inc. v. Tura, L.P.,* 112 F.3d 1146, 1153 (Fed.Cir. 1997).

To define the scope of the patented invention, the Court must first look at the words of the claims themselves. *Vitronics Corp.,* 90 F.3d at 1582 (citing *Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620 (Fed.Cir.1995)). Words in the claim are generally given their ordinary and customary meaning. However, "a patentee may choose to be his own lexicographer" and assign special definitions to the words in the claim, as long as those definitions are clearly set forth in the patent specification or file history. *Id.* (citing *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996)) "It is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* (citing *Markman,* 52 F.3d at 979).

The Federal Circuit has stated that "claims must be read in view of the specification, of which they are a part." *Id.* (citing *Markman,* 52 F.3d at 979); *see also Gart v. Logitech, Inc.,* 254 F.3d 1334, 1341 (Fed.Cir.2001) ("it is certainly correct that the specification and the prosecution history should be consulted to construe the language of the claims."). Because the specification must contain a description sufficient to enable those of ordinary skill in the art to make and use the invention, the specification " . . . . is the single best guide to the meaning of a disputed claim

---

1. Licensee estoppel was not the basis for granting the motion to dismiss the First Counterclaim (invalidity); given the covenant not to sue, lack of subject matter jurisdiction was.

term." *Id.* Indeed, in *Free Motion Fitness, Inc. v. Cybex International, Inc.,* 423 F.3d 1343, 1348–49 (Fed.Cir.2005), the Federal Circuit explained that dictionaries are to be consulted only after looking at the specification, because the specification is the best guide to the meaning of a term.

■ The court also may consider the prosecution history of the patent. *Vitronics Corp.,* 90 F.3d at 1582 (citing *Markman,* 52 F.3d at 980; *Graham v. John Deere,* 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). The prosecution history is the complete record of the proceedings before the Patent and Trademark Office. During the course of these proceedings, the applicant may have made express representations regarding the scope of the invention, so the prosecution history is "often of critical significance to determining the meaning of the claims." *Id.* (citing *Markman,* 52 F.3d at 980; *Southwall Tech., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir.1995)). Claim terms may appear to be plain language—as in this case, where most of the words have fairly straightforward definitions, or have passed over time into common usage. However, the prosecution history may demonstrate that the claims do not cover some matters that would otherwise be encompassed in the plain meaning of the words used. Prosecution histories often contain an analysis of the distinctions between the prior art and the applicant's claims, providing the court with clues to limitations of the claims. *Id.* at 1583; *Autogiro Co. of Am. v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 399 (1967).

■ Finally, "the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Tech., Inc.,* 54 F.3d at 1576. Even when the written description would otherwise support a construction, the prosecution history, which is generated after-

wards, can relinquish any coverage of that claimed embodiment. *Rheox, Inc. v. Entact,* 276 F.3d 1319, 1325–27 (Fed.Cir. 2002).

**The Relevant Patents**

The two relevant patents relate generally to packages for cards that have a magnetic strip, such as credit and debit cards.

Patent No. 5,720,158 (the '158 Patent) issued on February 24, 1998, based on an application filed on June 30, 1995. The preferred embodiment of Figure 1 shows a card package (10), which includes a card carrier (12) and a card (14). The "card 14 is integrally formed with...the card carrier 12 such that a unitary card package is provided." A4, col 2:14–18. The preferred embodiment of Figure 2 depicts a side view of the card package (10) and shows that the card carrier (12) and the card (14) are made from the same piece of material (34).

The card package (10) is perforated (shown by dashes) to define the card carrier (12) and the card (14). The perforations form a section of weakness in the card package, which renders the "card 14...selectively detachable from the card carrier 12." A4, col. 2:14–18. This allows the card to be separated easily from the carrier without the use of a tool and without significantly damaging the card.

The card (14) includes information that varies from customer to customer, such as text (name and address), a bar code (30), and an encoded magnetic strip (32). ("variable data") The card may also include information that does not vary from customer to customer, such as art work, instructions explaining how to use the card and promotional information relating to the establishment distributing the card. A4–A5, col. 2:66–3:7. ("non-variable data")

Additionally, the card includes a portion that projects from the card carrier. This

provides the advantage of allowing the magnetic strip of the card to be encoded with data in a traditional manner—that is, by swiping the card through a standard encoding device that writes data to the strip.

There is variable and non-variable data on the card carrier, which corresponds to the variable and non-variable data on the card.

Claim 8 of the '158 patent, which must be construed, recites some aspects of the preferred embodiments as follows:

A card package, comprising:

A card carrier; and

A card integrally formed with and selectively detachable from the card carrier,

the card having a portion thereof projecting from the card carrier and

the card having an encodable magnetic strip extending transversely across

the portion of the card projecting from the card carrier.

A6, col. 5:32–6:5.

Patent No. 5,921,584 (the '584 Patent) issued on July 13, 1999, based on an application filed on December 15, 1996. The '584 application is a continuation-in-part of the '158 application. With minor exceptions the '584 patent includes all of the disclosure of the '158 patent, including the description of the card package (10).

The '584 patent adds additional subject matter as follows: it describes that an aperture (88) is formed in the card carrier (84), which allows the card package (80) to be displayed on a hook at a retail establishment. B.10, col. 5:62–65, col. 6:25–29. Put more simply, the '584 patent adds a hole to the card carrier so that the package can be hung by a cash register or in some other handy place where it will be noticed by customers.

Claim 1 of the '584 patent recites some aspects of the preferred embodiments as follows:

A card display package, comprising:

a card carrier constructed of a sheet of material; and

a card connected to and selectively detachable from the card carrier,

the card having a portion thereof extending beyond an outer edge of the carrier and

the card having an encodable magnetic strip extending transversely across the portion of the card extending beyond the outer edge of the card carrier.

B11, col. 7:24–31.

Claims 8 of the '158 Patent and 1 of the '584 Patent will be referred to as the Subject Claims.

## Claim Construction

The parties have identified a total of thirteen terms that require or may require construction. In some cases, the parties agree on a meaning for the terms. In most cases where the definition is in dispute, the parties can agree on some portion of the definition. The court expresses its gratitude to counsel for their obvious effort to narrow the issues.

### A. A card package, comprising: ('158 Patent) A card display package, comprising: ('584 Patent)

Both parties agree that this is preambular language, which describes the invention. Because these phrases are not claim limitations, they need not be construed.

### B. a card carrier; (both patents)

Both parties agree that a card carrier consists of a piece of durable material, such as plastic, paper, or cardboard, which is capable of receiving printed information and which supports or holds a card.

Plaintiff believes that the carrier must be capable of receiving encoded as well as printed information; defendant disagrees. Defendant believes that the card carrier must be sized to fit into an envelope; plaintiff disagrees.

The '158 specification clearly indicates that the carrier is "preferably, a synthetic plastic . . . but any durable material capable of receiving printed matter or encodable matter can be used." (A4, col.2:43–49) The ability to receive encodable matter enables aspects of the preferred embodiment to be realized, including specifically printing a bar code (which is encodable matter) on the card carrier itself. Defendant suggests no reason why this clear requirement in the specification itself ought not be incorporated into the claim construction, especially since it would be impossible to affix a bar *code* on the card carrier unless the carrier could receive *encodable* matter. Since the language of the specification states that the carrier must be capable of receiving encodable matter, and the preferred embodiment shows a bar code encoded on the carrier, defendant's omission cannot be accepted.[2]

As for defendant's suggestion that the card carrier must be sized to fit into an envelope: it argues that this is compelled by the fact that, in the detailed description of the '158 patent, the card carrier, "serves to hold the card so that the card is not able to shift about the envelope *when the card is disposed in an envelope.*" A4, col 2:19–21 (Emphasis added). The '158 patent abstract claims both a card package and "a method for delivering a card to a customer," that method being placing the card and its carrier in an envelope, with the printed address of the customer showing through a window in the envelope, and then delivering the entire package to the customer.

However, the addition of language about fitting into an envelope adds nothing to the claim construction. There is no restriction anywhere in the patent on the size of the envelope; indeed, at A4, col. 2:39–42, the patentee specifically states that, "It will be appreciated that the information card 14 can be formed into a variety of shapes and sizes." Since the card is integrally incorporated into the carrier, it follows as the night the day that the card carrier must be able assume a variety of shapes and sizes. And of course there are many different sizes and shapes of envelopes in this world. I fail to see how incorporating language about the method for delivering the card carrier to its customers into the definition of the term "card carrier" advances the ball, and so I decline to adopt defendant's suggestion.

I also note that Claims 6 and 7 of the '158 patent (which is not in suit), which claim depends on Claim 5 (which is not in suit) makes reference to an envelope, but Claim 8 (which is in suit) does not include any such reference.

I adopt plaintiff's construction of the term.

### C. "A card" (both patents)

The parties tell me that the word "card" need not be construed. However, they also tell me that they disagree about what the word "card" means. I thus feel compelled to construe it.

Both plaintiff and defendant agree that "A card is a flat, stiff piece of durable material, such as plastic, paper or cardboard, which is capable of receiving printed information."

---

**2.** Defendant may be trying to suggest that the card carrier itself should not be made of encodable (i.e., magnetized) material; rather, it should only be able to have some extraneous "encodable matter" (such as a magnetic strip or a bar code) affixed to it. For a discussion of this concept, refer to my construction of the word "card," which follows.

Plaintiff argues that the words "or encodable" should be inserted between "printed" and "information." Defendant agrees that the "card" should be able to receive encodable information, but that this must come only in the form of affixing an encodable component (such as a magnetic strip) to the card. Thus, Defendant argues that the words "and which receives components to receive and/or store encodable information" should be added to the end of plaintiff's definition of the term "card."

The difference between plaintiff's and defendant's proposed construction seems to be that, under plaintiff's construction, the card itself might be made of encodable material, and thus could be encoded without the application of any extraneous matter; while defendant's construction limits the patent to cards that are not themselves encodable, but on which encodable "components" (such as magnetic strips) can be placed.

The card must be made of the same material as the card carrier (see below, "integrally formed with"). Thus, if the card carrier is constructed of material that is capable of receiving encodable matter (such as a bar code)—and it must be, since that is part and parcel of the specification—then the card necessarily will be capable of receiving encodable matter as well.

This does not alter the fact that both Claim 8 of the '158 patent and Claim 1 of the '584 patent disclose cards to which magnetic strips are affixed for the purpose of receiving encodable information. Nor does it alter the fact that, in the claim language for both claims in suit, the patentee requires that the card have an encodable magnetic strip affixed to it. The use of a magnetic strip to receive encodable information is part of the invention. But this restriction need not be incorporated into the definition of the word "card;" rather, it arises from the language of the claim and the description of the invention in the specification.

### D. "Integrally formed with" ('158 patent)

■ Both parties agree that this term should be construed as follows: "a card integrally formed with...the card carrier means the card and the carrier are formed from the same piece of material."

### E. "Selectively detachable" (both patents)

■ Both parties agree that this term should be construed as follows: "a card....selectively detachable from the card carrier means that the card and the card carrier may be separated by a customer without a tool and without causing significant damage to the card."

Defendant would have me add the words "or any card component" to the end of this agreed definition. As defendant itself argues elsewhere, a "component" is a "constituent element, as of a system." Since damage to any component ("constituent element") of the card (the system) would necessarily constitute damage to the card, defendant's proposed additional language is redundant and unnecessary and I decline to adopt it.

### F. "The card having..." (Both patents)

### G. "...a portion thereof.." (Both patents)

### H. "...projecting from the card carrier" ('158 patent)

### L. "....extending beyond an" ('584 patent)

### M. "..outer edge of the card carrier" ('584 patent)

■ The '158 patent includes the following claim language: "The card having a

portion thereof projecting from the card carrier." The '584 patent contains slightly different language: "That card having a portion thereof extending beyond an outer edge of the card carrier." Construing this language in the two patents is the critical exercise in this *Markman* hearing, because these formulations are the critical disputed elements of the Subject Claims. Although I group these portions of phrases together, I will break out particular portions when necessary.

### Having: Open or Closed

Plaintiff seeks to define the words "The card having..." in both patents as meaning "the card having at least," arguing that the word "having" is an "open" transitional word. The use of the transitional word "having" indicates that a claim may be open or closed. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l Inc.*, 246 F.3d 1336, 1348 (Fed.Cir.2001) The Court must consult intrinsic evidence to determine whether the phrase is open or closed. *Id.*

Defendant does not take a position on whether the word "having" should be interpreted as open or closed. Indeed, defendant argues that it does not matter whether I conclude that "having" is open or closed. Instead, defendant asks that I focus on the next phrase, "a portion thereof," which defendant defines as "less than the entire card." (Br. at 18), and which plaintiff defines as "part of."

If plaintiff is correct that "having" means "having at least," then the phrase "having a portion" changes to "having *at least* a portion." "Portion" means "part" or "less than the whole." But the phrase "at least a portion" includes the whole as well as less than the whole. So construing the word "having" as "having at least" fairly implies that the claims cover an em-

bodiment in which the entire card, not just a part of it, projects from the card carrier, as long as the carrier is "holding" or "supporting" the card in some way—as, for example, by being attached to the carrier at one end. Defendant disagrees with this, of course, but I need not reach its solutions (one for each patent) to the fair implication of an open definition of "having" unless I conclude that "having" should be construed as open rather than closed.

Relying solely on evidence intrinsic to the original patents (i.e., before reexamination), I conclude that plaintiff is correct—the term is open, not closed.[3]

█ For the '584 patent, the answer is simple. Clear intrinsic evidence of the patentee's intent that the term be open is found in the specification for the '584 patent (although not the claim language itself). That specification uses the phrase "having *at least* a portion of the card projecting from the card carrier." (B1) Since the specification is the single most important piece of intrinsic evidence, the matter would seem to be settled, at least in the context of the '584 patent. It does not matter that the preferred embodiment shows a card that only partly projects beyond the carrier; it is well settled that the invention is not limited to the preferred embodiment if the claim language is broader than that single embodiment. *See Gart v. Logitech*, 254 F.3d 1334, 1343 (Fed. Cir.2001).

The question then becomes whether the term "having a portion of the card" is to be read more narrowly in connection with the '158 patent, which is the fair import of defendant's argument. The answer, as plaintiff correctly argues, is found in the reexamination history of Claim 8, which has now been disallowed by the Examiner.

**3.** Defendant's statement that the open or closed nature of "having" is irrelevant amounts to a concession that the term should be interpreted as open—or so it seems to me.

 The parties, most particularly plaintiff, have placed aspects of the reexamination into the record. I at first questioned whether the reexamination history qualified as intrinsic evidence, or whether—because it post-dates the original allowance of the patent and the parties' entry into a license agreement—it is extrinsic evidence. It is my usual practice to consider only intrinsic evidence at the first stage of a *Markman* hearing, and to resort to extrinsic evidence only where intrinsic evidence fails to yield a solution. I have not yet asked the parties to submit extrinsic evidence in this case.

However, it is settled law that the prosecution history is intrinsic evidence, and I have not found any principle of patent law limiting that to material that was placed in the file wrapper prior to the allowance of the claim. I conclude that anything in the file wrapper that sheds light on the meaning of a term in a patent claim qualifies as intrinsic evidence—whether it pre-dates or post-dates the allowance of the claim.

The Examiner recently concluded that Claim 8 of the '158 patent was invalid because a certain prior art patent (the '311 patent) anticipated the claimed invention in the '158 patent. According to plaintiff, Claim 8 was cancelled during the reexamination (and plaintiff agreed that it should be cancelled) because, *inter alia*, the Examiner and plaintiff concluded that Claim 8 was anticipated by the '311 patent. A claim is anticipated by prior art if each and every element of the claim is included in the disclosure of a prior patent or publication. If the '311 anticipates the '158, then Claim 8 of the '158 must necessarily include an embodiment in which an entire card is attached to one end of the card carrier along a perforation or other point of weakness. Only by reading the word "having" in the '158 patent to mean "having at least" could the Examiner conclude that the '158 patent covered such an embodiment.

Thus, the reexamination of Claim 8, and its disallowance by the Examiner in view of the '311 patent, is the best possible evidence that the term "having" should be construed as meaning "having at least."

 I further note that this construction accords with the rule that the same claim term in two related patents are generally construed to have the same meaning. *Abtox, Inc., v. Exitron Corp.,* 131 F.3d 1009, 1010, *modifying* 122 F.3d 1019 (Fed.Cir.1997).[4]

### Portion

In connection with both patents, defendant asks that I construe "a portion thereof" to mean "less than the entire card." Defendant thus wants me to define "portion" as meaning "only a portion." I cannot do that without undermining the open nature of the word "having"—which is to say, if I accepted defendant's construction, I would read the concept of "having at least" out of the claim construction. In other words, defendant asks me to read the word "portion" as though the open term "having" were not immediately adjacent to it. That I cannot and will not do.

"Having a portion of the card" means "having at least some part of the card," a reading that fairly encompasses "having the entire card" and precludes "having only a portion."

### Projecting From the Card Carrier/Extending Beyond the Outer Edge of the Card Carrier

It is impossible to discuss these terms separately, because defendant defines

---

4. I am not here constrained by the usual rule that patent claims are to be construed, if possible, in a manner that preserves their validity, since I know that the Patent Office has concluded that the claims I am construing are invalid!

them in ways that would permit it to get around the problem of an open "having," while plaintiff defines them in ways that reinforce the implications of the open "having."

Plaintiff argues that "projecting" means "extending out, up, or forward from." Defendant says that "projecting from" means "...a portion of the card having opposed edges which are not bordered by the carrier."

Defendant has not offered this court any construction of the phrase "projecting from." It offers instead an example of how a card might "project[] from" the card carrier—an example that (not surprisingly) conforms to the preferred embodiment set forth in the patent. "A portion of the card having opposed edges which are not bordered by the carrier" does not define the phrase "projecting from."

Defendant's non-definition of "projecting from" would limit the invention to the preferred embodiment, in violation of the rule that the scope of the claims are not limited to the description of the preferred embodiment. *Gart*, 254 F.3d at 1343. Furthermore, Defendant's construction of "projecting from" (if you can call what defendant offers a "construction") would preclude an embodiment in which the entire card "projects" from the carrier, which would negate the openness of "having" (see the immediately preceding discussion). For these reasons, it seems inappropriate to adopt the construction proposed by defendant.

Nonetheless, defendant argues that adopting plaintiff's argument will cause the patent to cover an embodiment that the patentee expressly disclaimed—which, of course, cannot be. Thus defendant argues that plaintiff, acting as its own lexicographer, defined "projecting beyond the card carrier" and "extending beyond the outer edge of the card carrier" the entire phrases—in ways that are not necessarily consistent with the meanings of the constituent words in those phrases.

Defendant first notes that the term "projecting" appears throughout the '584 patent (although it is not part of the language of Claim 1 of the '584 patent), and argues that because the '584 patent is a continuation-in-part of the '158 patent, "projection" should be construed identically in both. *See Abtox Inc.*, 131 F.3d at 1010. Defendant is correct that the '584 patent specifications use the term "projecting from" or "projects" synonymously with the claim language "extending beyond." For that reason, I conclude that "projecting from" and "extending beyond" mean exactly the same thing.

Defendant then argues, "It is plain from the patentee's description of the 'projecting' in the '584 patent that the portion of the card which projects from the carrier is free from contact with the carrier and that the magnetic strip on the card extends across that 'projecting' portion." (Br. at 20).

The first half of defendant's statement is not plain, because it is clearly not true. Even if the entire card "projected from" or "extended beyond" the carrier (like the preferred embodiment of the '311 patent discussed above), the card would not be "free from contact with the carrier," because the card has to be "connected to" or "integrally formed with" the carrier. This means that, as manufactured, the card must be formed out of the same sheet of material as the carrier and it must be attached to the carrier. Defendant's "free from contact" statement is simply silly. If the card is not in contact with (i.e., does not touch) the card carrier, we are not talking about the claimed invention.

The second half of defendant's assertion—that the magnetic strip must extend across the portion of the card that projects

from the card carrier—*is* plain, because it is taken *in haec verba* from the language of the Subject Claims. Both patent claims in suit state that the card (but not the carrier) have an encodable magnetic strip extending transversely across "the portion of the card" that either "project[s] from the card carrier" ('158 patent) or "extend[s] beyond an outer edge of the card carrier." ('584 patent).

Defendant urges that this strip cannot be applied to any portion of the card that is immediately adjacent to the card carrier—by way of illustration, on attached Figure A, any portion of the card that is inside a figure formed by OE 1, OE 2, OE 3, OE 4, OE 5, and the imaginary line connecting the ends of OE 1 and OE 5—because plaintiff disclaimed such an embodiment, as to both patents, during the reexamination, and did so on the ground that, at the time of the invention, there was no way either to (1) apply the magnetic strip to the card alone, or (2) cut the magnetic strip at the tear line between the card and the carrier without damaging both the card and the carrier. (Def. Br. at 21) If something could not be accomplished at the time of the invention, it obviously cannot be part of the invention. It is for this reason that defendant so strenuously urges that the term "projects" must be defined in such a way as to preclude that embodiment.

I agree with defendant on this point. But what implications does defendant's argument have for the definition of the phrases "projecting from the card carrier" and "extending beyond the outer edge of the card carrier?"

It is easiest to tackle this issue using the words of the '584 patent, "extending beyond the outer edge of the card carrier."

Defendant argues that the word "perimeter" most closely corresponds to and best describes an "outer edge." (Br. At 29)

But defendant does not equate "outer edge" with "perimeter," Rather, it defines "outer edge" as "that portion of the perimeter of the card carrier that does not include the line of weakness which defines a border between the card and the card carrier." By way of illustration, on the attached Figures A and B, defendant's definition would include line segments OE 1, OE 2, OE 3, OE 4, and OE 5: the entire perimeter of the card carrier (but not the card), less the dotted lines (line segments OE 6, OE 7 AND OE 8) which are part of the perimeter, but not, under defendant's definition, part of the "outer edge."

Plaintiff, by contrast, defines "an outer edge" as "the line where the card carrier begins or ends, where the line is situated on the perimeter of the card carrier, and where a part of the perimeter may include a line of weakness which defines a border between the card and the card carrier." This is a cumbersome way of saying that the outer edges of the card carrier equate to the entire perimeter of the card carrier after the card is detached from the carrier. For plaintiff, the "outer edge" of the carrier includes the line of demarcation at which the card is attached to the carrier. Indeed, in Figure 1 in the '584 patent, plaintiff uses the term "outer edge" to include all the edges that comprise the perimeter of the card carrier, including the lines of weakness.

Defendant rejects plaintiff's contention that the entire perimeter of the card carrier is the carrier's "outer edge"—despite the rule that the patentee can be his own lexicographer—because the language of Claim 1 of the '584 patent clearly states that the encodable magnetic strip must be placed so that it "extend[s] transversely across the portion of the card *extending beyond the outer edge of the card carrier.*" ('584 patent) (Emphasis added). This means that the magnetic strip cannot be

applied to any portion of the card that is immediately adjacent to or enclosed by the border between the card and its carrier. For example, that in Figure A attached (which corresponds to Figure 1 in the '584 patent), one could not place the magnetic strip in the area of the card where the words "customer's name and address" appear. But if I were to accept plaintiff's definition of "outer edge," a practitioner could place the magnetic strip on that "interior" portion of the card, because anything outside of the perforation between the card and the carrier can literally be said to "extend[s] beyond" the carrier. It is for this reason that defendant excludes from its definition of the term "outer edge" the portion of the perimeter at which the card is attached to the carrier.

Clearly, a critical aspect of the invention is that the user be able to swipe the card without first having to detach it from the carrier (see, e.g., B6, top illustration). So defendant is correct that the magnetic stripe cannot be placed on any portion of the card that is immediately adjacent to the card carrier (or is surrounded by the card carrier, as shown in Figure A) The requirement that the magnetic strip be placed on the portion of the card that "extend[s] beyond the outer edge of the carrier" precludes defining "outer edge" as "the entire perimeter" of the card carrier. Indeed, if the entire perimeter of the card is the "outer edge," then a card that was entirely surrounded by the carrier (as in Figure C attached hereto) would "extend beyond" the outer edge of the carrier. This makes no sense, and contravenes the rule that a term used in a patent cannot be defined in a way that defeats the purpose of the invention as a whole. See Vivid Techs. Inc. v. Am. Sci. & Engineering Co. 200 F.3d 795, 805, (Fed.Cir.1999).

I recognize that, in the ordinary course, if a plaintiff defines a term (like "outer edge" in the text of the patent itself, that definition ought to control.) It can be argued that plaintiff's labeling of the perforations in Figure 1 of the '584 patent as "outer edges" 6, 7 and 8 constitutes its definition of those words. But in the context of the phrase "extending beyond the outer edge of the card carrier," the words "outer edge" cannot mean what plaintiff says they mean.

So I turn to defendant's proposed definition. For defendant, the "outer edge" does not include any portion of the carrier's perimeter that consists of the "area of weakness" at which the card can be detached from the carrier. That definition works as long as it does not read out of the patent the embodiment shown in Figure B to this opinion, in which the card emerges in its entirety from one end of the carrier, with no portion of the card being surrounded by the carrier, as it is in Figure A. Any definition of the term "outer edge" must encompass the Figure B embodiment, because that is the embodiment that is fairly implied by plaintiff's use of the open term "having [at least]."

As I understand defendant's definition of "outer edge," it does work—but not with the implication it urges. Implicit in defendant's definition is the notion that the card must project or extend out from a line running between two points along the perimeter of the carrier. (See reference to same in Defendant's Brief at 30). In Figure A, that line is an imaginary line that runs from the point where perimeter line OE 1 comes into contact with the card to the point where perimeter line OE 5 comes into contact with the card. But in Figure B to this opinion, the line is not imaginary—it is congruent to the line of weakness between the card and the carrier.

Defendant's definition of the term "outer edge" works in the context of the rest of the claim language. It allows the invention to work, because the card can be

swiped, and thus encoded, while it is attached to the carrier. It does not run afoul of plaintiff's disclaimer that the invention was not intended to include a placement of the strip in a location where the strip could not be cut without damaging the carrier and the card. But it does not eliminate the advantage that the patentee enjoys from the open definition of "having." Defendant is simply wrong when it urges that its definition somehow precludes having the '584 patent cover embodiments like Figure B. Defendant's definition thus solves all the problems while transgressing no principle of patent construction of which I am aware.

Having so defined the term for the '584 patent, I return to the '158 patent, which uses the slightly different language "projecting from the card carrier." I have already ruled that "projecting from" means the same thing as "extending beyond." *See supra.* From the description of the invention, it is clear enough that the portion of the card that "projects from" the card carrier is, with respect to the '158 patent, no different than the portion of the card that "extends beyond" the card carrier in the '584 patent—that is, it is any part of the card that protrudes or extends beyond the (imaginary) line running between OE 1 and OE 5 in Figure A or that is congruent with the line of weakness in Figure B.

### I. "Extending transversely across" (both patents)

■ Both parties agree that the word "transversely" means "across" or "set cross-wise."

Plaintiff proposes that this phrase be construed to mean "an encodable magnetic strip extending across [the portion of the card that either projects or extends beyond the card carrier], in substantially the same direction that the card would be moved to encode the magnetic strip."

Defendant proposes that this phrase be construed to mean "an encodable magnetic strip stretched across [the portion of the card . . . . .], in substantially the same direction as the card would be moved to read the magnetic strip."

There is no substantive difference between these two definitions; they differ only in defendant's substitution of the word "stretched" for "extending." The plaintiff's use of "extending" is tautological, but defendant's word "stretched" seems to imply elongation rather than positioning. I will use neither word, but instead define the term as "an encodable magnetic strip running from one side of the card to the other, in substantially the same direction as the card would be moved to read the magnetic strip."

### J. "a sheet of material" ('584 patent)

■ The parties agree that this term means "a piece of material that is thin in comparison to its length and width."

### K. "connected to" ('584 patent)

■ Plaintiff suggests that this term need not be construed at all, but if it is, proposes that the phrase "connected to" means "joined together or linked."

Defendant wants this term to be construed as congruent to the term "integrally formed with" that appears in the '158 patent.

The specification for the '584 patent uses the term "integrally formed" in lieu of the word "connected to." (See B9, col. 3, 1.39). Moreover, the '584 specifications indicate that the "card package" (i.e., the card and the card carrier) is formed, ". . . . .by first passing the sheet of material through a non-variable printing station where the non-variable data of the card package. . . . .is disposed on the first portion of the sheet of material that will cooperate to define the card carrier and on a second portion of the sheet of material that will

cooperate to define the information card." (B9, col.4, 1.24–32) Clearly, in the '584 patent as in the '158 patent, the carrier and the card are to be made of the same "sheet of material." Thus, it appears that the patentee, acting as his own lexicographer, has defined the words "connected to" more narrowly than their common dictionary definition (which would, for example, allow the card and its carrier to be made from two separate piece of material and affixed together with an adhesive), and congruently with the phrase "integrally formed with," as used in the '158 patent. I accept defendant's definition.

This constitutes the decision and order of the Court.